# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

ANTHONY CLINCH,

    Plaintiff,

    v.

PAMELA CHAMBERS, STEPHANIE
OLIVER, and GLYNN COUNTY,

    Defendants.

2:22-CV-94

## ORDER

Before the Court is Defendants Pamela Chambers, Stephanie Oliver, and Glynn County's motion for summary judgment. Dkt. No. 18. The motion has been briefed and is ripe for review. Dkt. Nos. 18, 20, 21, 24. For the reasons stated below, Defendants' motion is **GRANTED**.

## BACKGROUND

This case arises from an incident in which officers used a taser to arrest a resisting suspect. While Defendant Officers Pamela Chambers and Stephanie Oliver struggled to arrest Plaintiff Anthony Clinch for a possible felony, Officer Oliver tased Plaintiff. Dkt. No. 20-6. Clinch brought this case alleging violations of his constitutional rights, namely an excessive force claim arising under the Fourth Amendment against Defendants Chambers and Oliver, a failure to intervene claim against

Defendants Chambers and Oliver, and a municipal liability claim arising under the Fourth Amendment against Defendant Glynn County, Georgia.[1] Dkt. No. 1. Plaintiff also brings a state law claim for battery and assault against all Defendants. Id. Finally, Plaintiff seeks punitive damages and attorney's fees pursuant to federal and state law against all Defendants. Id.

**I.   Defendant Officers Responded to a Possible Hostage Situation Involving Plaintiff.**

The subject incident began when Plaintiff's girlfriend called 911 to report that Plaintiff was holding her hostage at a Winn-Dixie store in Brunswick, Georgia. Dkt. No. 20-1. Plaintiff's girlfriend also claimed that Plaintiff brought her to the store to withdraw money from an ATM. Id.; Dkt. No. 18-4 at 28:4-13. Dispatch soon relayed this information to law enforcement in the area. Dkt. No. 20-1. Dispatch identified the suspect as Anthony Clinch and described him as a black male with dreadlocks. Dkt. No. 20-3; Dkt. No. 18-4 at 28:14-18. An officer soon spotted Plaintiff walking away from the store and radioed that Plaintiff was wearing blue jogger pants and a white tank top. Dkt. No. 18-3 at 20:14-18; Dkt. No. 18-4 at 29:1-6. This same officer added that Plaintiff had stolen his girlfriend's phone and keys. Dkt. No. 18-4 at 29:17-

---

[1] Plaintiff's complaint combined excessive force and failure to intervene as the same claim. Dkt. No. 1. As these allegations have different requirements, the Court treats them as separate claims.

18.

Officer Chambers[2] was driving through the area at this time and passed Plaintiff as he walked away from the store. Dkt. No. 18-3 at 20:13-14. She confirmed his description with the dispatch center and then turned her car around to find Plaintiff. Id. at 20:14-22. Plaintiff noticed Officer Chambers's squad car and "made a beeline" toward a nearby house. Id. at 24:9-23. Officer Chambers followed, parked her car, and exited to pursue Plaintiff. Id. at 24:14-16. When Plaintiff saw Officer Chambers exit her vehicle, he walked quickly to the backyard of the house. Id. at 25:2-20. Officer Chambers then radioed that Plaintiff looked as though he was about to flee and asked for additional units to assist. Dkt. No. 18-4 at 30:1-6.

Officer Oliver[3] responded to this call for backup. Dkt. No. 18-4 at 30:1-3. She drove to the house where Officer Chambers had located Plaintiff. Id. at 33, 36. She then exited her car, activated her body-worn camera ("body camera"), and ran toward the backyard of the house. Dkt. No. 20-6 at 00:19-00:36. At this point, before she encountered Plaintiff, Officer Oliver explained: "I

---

[2] At the time of the incident, Officer Chambers was employed as a deputy with the Glynn County Sheriff's Office. Dkt. No. 18-3 at 7-8. She still works in this position. Id.

[3] At the time of the incident, Officer Oliver was a lieutenant with the Glynn County Police Department. Dkt. No. 18-4 at 10. She is currently a captain with the same department, supervising a patrol division. Id. at 9.

believed that he was involved in a violent, forcible felony where he had held a female victim hostage and essentially committed a robbery by forcing her to obtain money from an ATM and then had also fled from a law enforcement officer." Dkt. No. 18-4 at 30:22–25, 31:1. Officer Oliver's body camera captured the remainder of Defendants' interaction with Plaintiff that gives rise to this case. Dkt. No. 20-6.[4]

## II. Defendants Found Plaintiff, Who Refused to Cooperate.

Officer Oliver was the first officer to encounter Plaintiff. Id. at 00:37–00:39. Plaintiff's appearance in the body camera footage matches the description relayed to Defendants: a black male with dreadlocks wearing blue jogger pants and a white tank top. Id. Plaintiff also appears to be holding a set of keys and a phone in the footage. Id. at 00:41. When he first encountered Officer Oliver, Plaintiff was talking on the phone. Id. Plaintiff was aware at this time that Officer Oliver was a police officer because she was in uniform. Dkt. No. 18-2 at 38:11–14.

Officer Oliver began by telling Plaintiff to "stop right there." Dkt. No. 20-6 at 00:38–00:39. She repeated this command twice. Id. at 00:39–00:42. Plaintiff continued moving and

---

[4] While the body camera footage is not entirely clear as to the physical specifications of Plaintiff and Defendants, at the time of the incident, Plaintiff is 5'10" and 130 pounds, dkt. no. 18-2 at 24:18–20, Officer Chambers is 5'7" and around 160 pounds, dkt. no. 18-3 at 12:4–9, and Officer Oliver is around 5'3" and around 130 pounds, dkt. no. 18-4 at 17:2–15.

responded "for what?" Id. Officer Oliver repeated the command again
and reached her hand toward Plaintiff, who moved away from her.
Id. at 00:40-00:43. Officer Oliver then drew her taser[5] and aimed
it at Plaintiff. Id. at 00:43-00:44. While aiming the taser with
one hand, Officer Oliver grabbed Plaintiff's wrist with her other
hand, but Plaintiff pulled free. Id. at 00:44-48. She continued
telling Plaintiff to "stop" and warned that she would tase him if
he did not. Id. at 00:44-00:50.

Plaintiff continued asking why he was being stopped and made
no attempts to flee. Id. at 00:44-00:52. Plaintiff was also
unarmed, and Defendants knew this at the time of the incident.
Id.; Dkt. No. 18-3 at 29:14-24; Dkt. No. 18-4 at 31:6-10. Officer
Oliver did not answer Plaintiff's questions about why he was being
stopped. Dkt. No. 20-6 at 00:38-00:55. When asked why in her
deposition, she explained:

> That was a very precarious situation for me. I am in a
> situation right there by myself with an alleged violent

---

[5] Officer Oliver was equipped with a Taser 7 model. Dkt. No. 18-4
at 165:6-22. According to Plaintiff's expert: "The Taser is a
Conducted Energy Weapon, (CEW), as defined by the manufacturer,
Axon. It is a handheld, battery operated tool which uses controlled
electrical current designed to disrupt a person's sensory and motor
nervous system by means of deploying electrical energy sufficient
to cause temporary uncontrolled muscle contractions, or Neuro
Muscular Incapacitation, ('NMI'). As a result, the electrical
energy can override the person's voluntary motor responses for a
brief duration." Dkt. No. 20-12 at 9. Officer Oliver successfully
completed training for use of the Taser 7 the month before this
incident occurred. Dkt. No. 18-4 at 171-73. At the time of the
incident, Officer Oliver's use of force training was up to date.
Dkt. No. 20-11 at 12.

> offender who had already fled from another officer. This
> wasn't a situation where I had [] time to explain to him
> what was going on. He needed to submit to my command to
> stop.

Dkt. No. 18-4 at 38:2-7. She added that Plaintiff "looked like he
was about to flee again . . . . He started backing up as soon as
I was telling him to stop. And when . . . I went to reach to grab
him he continued to back away from me." Id. at
38:10-13. While this took place, Officer Chambers appeared from
behind the house and ran toward Plaintiff and Officer Oliver. Dkt.
No. 20-6 at 00:48-00:52.

## III. Defendants Attempted to Handcuff Plaintiff, but Plaintiff Physically Resisted.

Officer Chambers approached Plaintiff from behind with a pair
of handcuffs. Id. at 00:49-00:51. She grabbed Plaintiff's arms and
attempted to force them behind his back, but Plaintiff pulled free.
Id. at 00:51-00:57. Plaintiff moved his arms out to his sides and
up in the air to avoid the handcuffs. Id. at 00:51-01:00. He
continued to ask what was going on and why he was being stopped.
Id. Officer Oliver did not answer and repeated her warning that
she would use her taser if Plaintiff failed to comply. Id. at
00:55-01:01.

After her first failed attempt to handcuff Plaintiff, Officer
Chambers yelled at him, "Put your hands behind your back now." Id.
at 01:00-01:01. Instead, Plaintiff kept his arms at his sides,

6

although this did allow Officer Chambers to get one handcuff on his left wrist. Id. at 1:01-01:04. Immediately after his left wrist was handcuffed, Plaintiff jerked his left arm away from Officer Chambers. Id. at 1:02-01:05. As soon as this happened, Officer Oliver fired her taser,[6] which struck the right side of Plaintiff's torso. Id. This probe, however, malfunctioned. Dkt. No. 18-4 at 57:12-25. When deposed, Plaintiff said that he felt a weak shock from the probe. Dkt. No. 18-2 at 44:17-24, 45:2-8. At the time of the incident, Plaintiff showed no signs of being affected by this first tasing. Dkt. No. 20-6 at 1:02-1:06.

Plaintiff continued to resist. Id. Officer Chambers again ordered Plaintiff to put his hands behind his back. Id. at 01:08-01:10. Plaintiff braced his elbows against his sides and spread his arms apart, which prevented Officer Chambers from handcuffing him. Id. at 01:08-01:12. He asked, "what did I do?" and Officer Oliver answered "because you stole." Id. at 01:10-01:14. The rest of her answer was cut off when Plaintiff responded: "I didn't steal shit. She brought me up here. What [are] you talking about?" Id. at 01:14-01:17. Plaintiff explained that during this part of the encounter, "I was just standing my ground."

---

[6] Officer Oliver explained in her deposition that she tried to tase Plaintiff at this time "[b]ecause Deputy Chambers was attempting to handcuff him and he was not allowing her to do so. He was snatching his arms away from her. And at that point to gain compliance to get him under handcuffs, I attempted to TASER." Dkt. No. 18-4 at 55:7-11.

Dkt. No. 18-2 at 47:2. He later acknowledged that he did not comply with Defendants' commands because they would not explain why he was being arrested. Id. at 49:5–9. He also acknowledged that nothing physically prevented him from putting his hands behind his back. Id. at 49:16–19.

After the second failed attempt to handcuff Plaintiff, Officer Chambers ordered Plaintiff to "get on the ground." Dkt. No. 20-6 at 01:20–01:24. He did not. Id. Defendants then tried to force Plaintiff to the ground. Id. at 01:24–01:30. This attempt also failed. Id. at 01:30–01:36. During the struggle to force Plaintiff down, Plaintiff was on top of Officer Chambers, who was on her back on the ground. Id. at 01:33–01:41. She explained in her deposition that this put her safety in jeopardy, as Plaintiff could have taken her gun while she was in this position. Dkt. No. 18-3 at 37:21–24, 51:19–22. However, Plaintiff made no attempts to grab Officer Chambers's gun. Dkt. No. 20-6 at 01:33–01:47. Rather, Plaintiff stood up and pulled himself away while the officers failed to hold him down. Id. Defendants tried to force Plaintiff's arms behind his back again but failed. Id. at 01:47–02:17. While this happened, Plaintiff told Defendants: "If I wanted to get away from y'all females I could've been got away." Id. at 02:10–02:13.

## IV.   Officer Oliver Tased Plaintiff.

As Plaintiff said that he could get away if he wanted, Officer Oliver drew her taser again and aimed it at Plaintiff. Id. at

02:23–02:26. When deposed, she explained: "I removed the [taser] [the second time] because at this point I knew that Deputy Chambers and I would not be able to physically overpower him to get him in handcuffs. We had attempted numerous times and failed numerous times. And my thought process was the only way we would be able to get him in handcuffs would be to utilize the [taser] and handcuff him under power." Dkt. No. 18-4 at 64:4-10. Officer Oliver aimed the taser's laser sights at Plaintiff's stomach. Dkt. No. 20-6 at 02:23–02:55.

Officer Chambers continued to hold one of Plaintiff's arms and called out for other officers on foot to come. Id. at 02:30–02:35. Officer Oliver repeated that she would tase Plaintiff. Id. at 02:40–02:46. Plaintiff again asked "what did I do?" and Officer Oliver told him that he stole his girlfriend's phone and keys. Id. at 02:46–02:52. Officer Oliver then tried to grab Plaintiff's free arm, but again Plaintiff pulled free. Id. at 02:53–03:01.

When this happened, Officer Oliver told Officer Chambers to let go of Plaintiff.[7] Id. at 03:00-03:02. The two officers backed away and Officer Oliver raised her taser to fire. Id. Officer Oliver announced: "Alright, I'm tasing you again." Id. at 03:02–03:04. She fired, and Plaintiff immediately fell to the ground.

---

[7] Officer Oliver told Officer Chambers to release Plaintiff because Officer Chambers could have also been tased—and possibly incapacitated—if she held Plaintiff while he was being tased. Dkt. No. 18-4 at 70:11-18.

Id. at 03:03–03:10. The sound of the electrical current pulsing from the taser is clearly audible in the footage. Id. Officer Oliver's body camera also shows the taser prong strike Plaintiff's throat. Id. She explained that this was an accident. Dkt. No. 18-4 at 179:14–22. Officer Oliver did not use the laser sights when she tased Plaintiff because "[i]n a situation like this when it's such close quarters it's normal to do just the point and shoot [technique] where you're reaching your hands out just like a firearm and you're pointing at the subject." Id. at 73:9–13.

After Plaintiff collapsed, Defendants handcuffed him without further resistance. Id. at 03:10–03:20. Plaintiff was immediately responsive and began talking again. Id. at 03:20–03:55. Additional officers soon arrived and began moving Plaintiff away from the scene. Id. at 03:57–04:35. Even after multiple officers arrived, Plaintiff continued to physically resist being moved by the officers. Id. at 04:32–04:38. Emergency medical personnel met the officers at the scene and took Plaintiff to the hospital, where the probe was removed and he received treatment. Id. at 09:00–12:00; Dkt. No. 18-2 at 61–62. Apart from his throat feeling painful for a month following the incident, Plaintiff has no long-term injuries from the tasing. Id. at 62–64.

Officer Oliver believed Plaintiff was fighting her and Officer Chambers. Dkt. No. 18-4 at 54:5–23. She explained that she

tased Plaintiff because he resisted arrest, pulled away from Officer Chambers, and—at the time—she believed Plaintiff was possibly going to strike Officer Chambers with his handcuffed left arm. Id. at 85. She also noted in her deposition that she did not initially tase Plaintiff because "I was trying to give him an opportunity to comply . . . . I'm telling him I'm going to tase him if he doesn't comply. He fails to comply so I used justified force to get him to comply." Id. at 88:8-12.

**V.   Glynn County Police Reviewed the Incident and Cleared Officer Oliver of Any Wrongdoing.**

After this incident, Plaintiff filed a use of force complaint against Officer Oliver with the Glynn County Police Department. Dkt. No. 20-11 at 10. The Police Department tasked Captain Jeremiah Bergquist of the Glynn County Police Department to investigate the incident and determine whether Officer Oliver acted wrongfully. Id. at 3. As part of his investigation, Captain Bergquist reviewed Officer Oliver's body camera footage, police radio recordings about the incident, the initial 911 call, Glynn County Police Department policies on the use of force, written reports, and Officer Oliver's police records. Id. He also interviewed Plaintiff, Officer Oliver, other officers who responded to the incident, and the owner of the house where the incident occurred.[8]

---

[8] Captain Bergquist requested to interview Officer Chambers, but the Glynn County Sheriff's Office declined this request. Dkt. No.

Id. at 6–10.

The investigation cleared Officer Oliver of any wrongdoing.

Id. at 13–14. Specifically, Captain Bergquist found in his report:

It is reasonable to conclude Lt. Stephanie Oliver was
acting within the parameters of policy, case law, and
Georgia statute[s] during the incident with Anthony
Clinch Jr. It was believed Mr. Clinch had just held a
female victim hostage and was forcing her to withdraw[]
money from an ATM inside of Winn Dixie located at Hyde
Park Commons. Upon seeing law enforcement officers, it
appeared as through Mr. Clinch was attempting to elude
officers and then took flight upon seeing [Officer]
Chambers. Mr. Clinch was given several verbal commands
to stop, and officers attempted several times to
physically take Mr. Clinch into custody. At the point in
time [] when physical force was applied, Mr. Clinch was
actively resisting arrest by snatching his hands away
from officers, as well as attempting to walk away. Lt.
Stephanie Oliver had probable cause to detain Mr.
Clinch.

Id. The investigation report concluded that Officer Oliver was

"exonerated."[9] Id. at 14. Plaintiff thereafter filed the pending

---

20-11 at 8. Instead, he reviewed Officer Chambers's written report.
Id.

[9] Plaintiff submitted a report by Scott A. DeFoe, an expert in law
enforcement use of force, who investigated Defendants' conduct.
Dkt. No. 20-12. Mr. DeFoe concluded: (1) Defendants "failed to use
de-escalation and defusing techniques during their interaction
with Mr. Anthony Clinch;" (2) "a reasonable Police Officer would
not have deployed her Taser 7, Conducted Energy Weapon, at any
time in this matter as Mr. Anthony Clinch was inquiring why he was
being detained during the initial Taser deployment in probe/dart
mode and the subsequent Taser deployment in probe/dart mode;" (3)
Officer Chambers "failed to Intervene and advise Glynn County
Police Department Lieutenant Stephanie Oliver to holster her Taser
7 and properly de-escalate the situation by controlling her
emotions and simply advise Mr. Anthony Clinch the reason he was
being detained;" (4) "the Glynn County Police Department should
have determined through its review process that the use of the
Taser 7 (both deployments in probe/dart mode) by Lieutenant

case. Dkt. No. 1.

**LEGAL AUTHORITY**

The Court should grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "The mere existence of a scintilla of evidence in support of the

---

Stephanie Oliver were unreasonable, unnecessary, and inappropriate based on the totality of the circumstances;" and (5) "there was a failure by the Glynn County Police Department to properly train Lieutenant Stephanie Oliver or a departure from training by Lieutenant Stephanie Oliver on the following subject matters: Defusing Techniques, De-Escalation Techniques, Working as a Team, Verbal Strategies, Active Listening Skills, Use of Chemical Munitions/Agents/Irritants, Control Holds, Situational Awareness, Weapons Retention Techniques, Ground Control, use of Less Lethal Force, (Taser 7)." Id. at 6-13.

[nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party. Id. at 252. Additionally, the party opposing summary judgment "may not rest upon the mere allegations or denials in [his] pleadings. Rather, [his] responses . . . must set forth specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

The Court views the record evidence "in the light most favorable to the [nonmovant]," Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and will draw all justifiable inferences in the nonmovant's favor, Anderson, 477 U.S. at 255.

## DISCUSSION

### I.  Applicable Law

#### 1. 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code ("§ 1983") provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. Section 1983 creates a right of action for vindicating federal rights guaranteed by the

Constitution and federal statutes. <u>Baker v. McCollan</u>, 443 U.S. 137, 144 n.3 (1979). It is not a source of substantive rights. <u>Id.</u>

To prevail in a § 1983 claim, a plaintiff must establish that "the conduct complained of (1) was committed by a person acting under color of state law and (2) deprived the complainant of rights, privileges, or immunities secured by the Constitution or laws of the United States." <u>Harvey v. Harvey</u>, 949 F.2d 1127, 1130 (11th Cir. 1992) (citing <u>Flagg Bros. v. Brooks</u>, 436 U.S. 149, 156–57 (1978)).

### 2. Federal Qualified Immunity, Generally

Even when a plaintiff can prove the elements of a § 1983 claim, official immunity may nevertheless block recovery of damages. Michael L. Wells, *Absolute Official Immunity in Constitutional Litigation*, 57 Ga. L. Rev. 919, 922 (2023). Official immunity is divided into two categories: absolute immunity and qualified immunity. <u>Id.</u>; <u>see also</u> <u>Pierson v. Ray</u>, 386 U.S. 547, 555–57 (1967). As law enforcement officials are protected under the doctrine of qualified immunity, <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991), the Court need not address the doctrine of absolute immunity.

Qualified immunity is an affirmative defense. <u>Ledea v. Metro-Dade Cnty. Police Dep't</u>, 681 F. App'x 728, 729 (11th Cir. 2017) (citing <u>Skritch v. Thornton</u>, 280 F.3d 1295, 1306 (11th Cir. 2002)). When successfully invoked, qualified immunity shields from civil

liability government officials who perform discretionary functions. Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity allows "government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." Durruthy v. Pastor, 351 F.3d 1080, 1087 (11th Cir. 2003) (citation omitted). It shields "all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted).

"An official asserting the affirmative defense of qualified immunity must initially establish that he was acting within the scope of his discretionary authority, and the burden then shifts to the plaintiff to show that the official is not entitled to qualified immunity." Ledea, 681 F. App'x at 729 (citing Skop v. City of Atlanta, 485 F.3d 1130, 1136–37 (11th Cir. 2007)). An official acts within the scope of his discretionary authority if he performs a legitimate job-related function through means that were within his power to utilize. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004) (citing Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1185 n.17 (11th Cir. 1994) ("A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that

16

challenged actions occurred in the performance of the official's duties and within the scope of this authority.")).

If the defendant official establishes that his relevant conduct fell within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity does not apply under the two-prong test established by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001). Under this test, the Court must determine whether the facts viewed in the light most favorable to the plaintiff "show the officer's conduct violated a constitutional right." Id.; see also Hope v. Pelzer, 536 U.S. 730, 736 (2002) ("The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation."); Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (citing Scott v. Harris, 550 U.S. 372, 377 (2007)). Second, the Court must determine whether the right allegedly violated was clearly established at the time of the violation. Hope, 536 U.S. at 739; Saucier, 533 U.S. at 201; Scott, 550 U.S. at 377; Underwood v. City of Bessemer, 11 F.4th 1317, 1328 (11th Cir. 2021) ("[W]e ask two questions: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and (2) if so, whether the right at issue was clearly established at the time of the defendant's alleged misconduct." (internal quotation marks omitted)). The Court may analyze these two prongs in any order.

Pearson v. Callahan, 555 U.S. 223, 242 (2009); Underwood, 11 F.4th at 1328. Qualified immunity will shield the defendant official from civil liability if a plaintiff fails either prong of the analysis. Id.

The "clearly established" prong merits further discussion. "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." District of Columbia v. Wesby, 583 U.S. 48, 63 (2018) (internal quotation marks omitted) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). "[E]xisting law must have placed the constitutionality of the officer's conduct 'beyond debate.'" Id. In other words, a legal principle must be "settled law" that is dictated by controlling authority or a robust consensus of cases of persuasive authority. Id. (citing al-Kidd, 563 U.S. at 741–42).

In the Eleventh Circuit, there are three ways to show that a law is clearly established. Edger v. McCabe, 83 F.4th 858, 864 (11th Cir. 2023). They are as follows:

> First, a plaintiff may show that a "materially similar case has already been decided," whose facts are similar enough to give the police notice. See Keating v. City of Miami, 598 F.3d 753, 766 (11th Cir. 2010). Second, he may show that a "broader, clearly established principle should control the novel facts" of his case. Id. This "broader" principle may be derived from "general statements of the law contained within the Constitution, statute, or caselaw." Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005) (alteration adopted) (quoting Willingham v. Loughnan,

> 321 F.3d 1299, 1301 (11th Cir. 2003)). Finally, a
> plaintiff may show that the officer's conduct "so
> obviously violates [the] constitution that prior case
> law is unnecessary." <u>Keating</u>, 598 F.3d at 766 (quoting
> <u>Mercado</u>, 407 F.3d at 1159).

<u>Id.</u> There is no requirement that a case be directly on point for

a right to be clearly established, but the Court must be mindful

of the specific context of the case. <u>Rivas-Villegas v. Cortesluna</u>,

595 U.S. 1, 7-8 (2021) (citing <u>White v. Pauly</u>, 580 U.S. 73, 79

(2017)).

"Because § 1983 'requires proof of an affirmative causal

connection between the official's acts or omissions and the alleged

constitutional deprivation,' each defendant is entitled to an

independent qualified-immunity analysis as it relates to his or

her actions and omissions." <u>Alocer v. Mills</u>, 906 F.3d 944, 951

(11th Cir. 2018) (quoting <u>Zatler v. Wainwright</u>, 802 F.2d 397, 401

(11th Cir. 1986) (per curiam) (citation omitted)). The Court "must

be careful to evaluate a given defendant's qualified-immunity

claim, considering only the actions and omissions in which that

particular defendant engaged." <u>Id.</u>

When analyzing the complex issues that arise in § 1983

litigation where defendants have asserted qualified immunity

defenses at the summary judgment stage, it is critical to reiterate

that the Rule 56 standard still governs. If genuine disputes of

material fact exist, the Court cannot grant summary judgment. Fed.

R. Civ. P. 56. In this case, there is no dispute that Defendant

Officers Chambers and Oliver have established they were acting within the scope of their discretionary duties at all relevant times. Plaintiff, therefore, must establish that Defendants are not entitled to qualified immunity. Ledea, 681 F. App'x at 729.

### 3. Georgia Qualified Immunity, Generally

Public officers and employees in the state of Georgia receive "limited protection from suit in their personal capacity." Cameron v. Lang, 549 S.E.2d 341, 344 (Ga. 2001) (footnote omitted). Georgia's Constitution provides:

> Except as specifically provided by the General Assembly in a State Tort Claims Act, all officers and employees of the state or its departments and agencies may be subject to suit and may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions. Except as provided in this subparagraph, officers and employees of the state or its departments and agencies shall not be subject to suit or liability, and no judgment shall be entered against them, for the performance or nonperformance of their official functions.

GA. CONST. art. I, § II, para. IX(d). The term "official functions" means "any act performed within the officer's or employee's scope of authority, including both ministerial and discretionary acts." Gilbert v. Richardson, 542 S.E.2d 476, 483 (Ga. 1994). "A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." McDowell

v. Smith, 678 S.E.2d 922, 924 (Ga. 2009) (internal quotation marks omitted) (quoting Murphy v. Bajjani, 647 S.E.2d 54, 57 (Ga. 2007)). A discretionary act "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." Id.

"Under Georgia law, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure." Cameron, 549 S.E.2d at 344 (citing Gilbert, 452 S.E.2d at 482). Georgia's rationale for this immunity is to preserve a public officer's "independence of action without fear of lawsuits and to prevent a review of his or her judgment in hindsight." Id. (citing O.C.G.A. § 50-21-21 ("[T]he proper functioning of state government requires that state officers and employees be free to act and to make decisions, in good faith, without fear of thereby exposing themselves to lawsuits and without fear of the loss of their personal assets.")).

Georgia's doctrine of qualified immunity protects county law enforcement officers. Collins v. Schantz, 893 S.E.2d 185, 187 (Ga. Ct. App. 2023) (citation omitted). "[C]ounty law enforcement officers are entitled to qualified immunity for the negligent performance of discretionary acts within the scope of their authority; they may be personally liable if they negligently

perform a ministerial act or act with actual malice or an intent to injure." Cameron, 549 S.E.2d at 345 (citation omitted). Georgia's Supreme Court has found "actual malice" to mean "a deliberate intention to do wrong." Morrow v. Hawkins, 467 S.E.2d 336, 337 (Ga. 1996). Likewise, "intent to injure" means "an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury. This definition of intent contains aspects of malice, perhaps a wicked or evil motive." Kidd. v. Coates, 518 S.E.2d 124, 125 (Ga. 1999) (internal quotation marks omitted) (citations omitted).

When a defendant officer moves for summary judgment on the basis of qualified immunity under Georgia law, the defendant bears the initial burden of establishing that he is entitled to immunity. Griffith v. Robinson, 884 S.E.2d 532, 534 (Ga. Ct. App. 2023) (citation omitted). If the defendant meets this burden, the burden then shifts to the plaintiff, as the nonmoving party. Id. The plaintiff must produce evidence that creates a genuine issue of material fact as to whether the defendant negligently performed a ministerial act or performed a discretionary act with malice or an intent to injure. Id.

In sum, Georgia's doctrine of qualified immunity shields law enforcement officers who intentionally perform a discretionary act with legal justification. Upshaw v. Columbus Consol. Gov't, 894 S.E.2d 75, 90 (Ga. Ct. App. 2023) (citing Porter v. Massarelli,

692 S.E.2d 722, 726 (Ga. Ct. App. 2010)). There is no dispute in this case that Defendant Officers Chambers and Oliver intentionally performed discretionary acts. Defendants, therefore, have met their initial burden. The burden now shifts to Plaintiff, who must establish that Defendants acted without legal justification or with malice or an intent to injure Plaintiff. Id.; Griffith, 884 S.E.2d at 534. The Court now turns to Plaintiff's claims.

## II. Plaintiff's Section 1983 Fourth Amendment Excessive Force Claim Against Defendant Officers Chambers and Oliver

### 1. Overview

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The quintessential seizure of a person under the Fourth Amendment is an arrest. Torres v. Madrid, 141 S. Ct. 989, 995 (2021) (citing California v. Hodari D., 499 U.S. 621, 624 (1991)). The Fourth Amendment prohibits the use of excessive force to make an arrest. Charles v. Johnson, 18 F.4th 686, 699 (11th Cir. 2021) (citation omitted).

A claim that law enforcement officers have used excessive force during an arrest or a seizure is analyzed under the Fourth Amendment's reasonableness standard. Graham v. Connor, 490 U.S. 386, 395 (1989). In applying this standard, the Court must look at

the totality of the circumstances surrounding the arrest. Tennessee v. Garner, 471 U.S. 1, 9 (1985); Charles, 18 F.4th at 699. This "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 395 (citing Garner, 471 U.S. at 8–9). "[T]he force used to carry out an arrest must be 'reasonably proportionate to the need for that force.'" Johnson v. White, 725 F. App'x 868, 876 (11th Cir. 2018) (citing Lee, 284 F.3d at 1198).

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396–97. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396 (citing Terry v. Ohio, 392 U.S. 1, 20–22 (1968)); see also Vaughan v. Cox, 343 F.3d 1323, 1331 (11th Cir. 2003) ("We are loath to second-guess the decisions made by police officers in the field.").

Determining whether an officer's use of force is unconstitutionally excessive involves two steps. Charles, 18 F.4th

at 699. First, the Court asks whether the specific kind of force used is categorically unconstitutional. Id. (citing Hope, 536 U.S. at 745-46). Second, if the type of force used is not categorically unconstitutional, the Court weighs the Graham factors and then asks whether the amount of force used was excessive. Id. This inquiry is an objective one. Graham, 490 U.S. at 397. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. (citations omitted). The Eleventh Circuit has distilled this inquiry into six factors:

> we consider these factors when evaluating any [non-lethal] use of force: (1) the severity of the suspect's crime, (2) whether the suspect poses an immediate threat of harm to others, (3) whether the suspect is actively resisting arrest or trying to flee, (4) the need for the use of force, (5) the relationship between the need for force and the amount of force used, and (6) how much injury was inflicted.

Wade v. Daniels, 36 F.4th 1318, 1325 (11th Cir. 2022) (citing Mobley v. Palm Beach Cnty. Sheriff Dep't, 783 F.3d 1347, 1353 (11th Cir. 2015) (per curiam)).[10]

## 2. Analysis

Plaintiff claims Defendants used excessive force by "attack[ing] Plaintiff in an attempt to tackle him" and using "a

---

[10] The six-factor inquiry described in Wade encompasses the three factors set forth in Graham. Wade, 36 F.4th at 1315.

potentially lethal electronic control device against Plaintiff."
Dkt. No. 1 ¶ 54. These claims must be analyzed under the Fourth
Amendment's reasonableness standard. Graham, 490 U.S. at 395.
Applying this standard requires the Court to follow the Eleventh
Circuit's two-step analysis. Charles, 18 F.4th at 699.

First, was the specific type of force used by Defendants
categorically unconstitutional? Id. The answer to this question is
a clear "no." Tackling an arrestee is not categorically
unconstitutional. Id. As the Eleventh Circuit has explained: "We
have never held that a tackle is a categorically unconstitutional
kind of force. And for good reason: It is obvious that a police
office[r] will be authorized to tackle an arrestee under some
circumstances." Id. (footnote omitted). The use of a taser is also
not categorically unconstitutional. Id. at 701. The Eleventh
Circuit has "found that the use of a taser can be appropriate in
a wide array of situations." Id. (citing Hoyt v. Cooks, 672 F.3d
972, 980 (11th Cir. 2012); Zivojinovich v. Barner, 525 F.3d 1059,
1073 (11th Cir. 2008); Draper v. Reynolds, 369 F.3d 1270, 1278
(11th Cir. 2004)). Any other uses of physical force by Defendants,
such as grabbing Plaintiff's arms or handcuffing Plaintiff, are
not categorically unconstitutional.  See Graham, 490 U.S. at 396
("Our Fourth Amendment jurisprudence has long recognized that the
right to make an arrest or investigatory stop necessarily carries
with it the right to use some degree of physical coercion or threat

26

thereof to effect it." (citation omitted)); Scott v. City of Red Bay, 686 F. App'x 631, 633 (11th Cir. 2017) ("An officer has the right to use some degree of physical force to make an arrest." (citations omitted)).

Second, because the types of force used by Defendants were not categorically unconstitutional, the Court must now ask whether the amount of force used was excessive. Charles, 18 F.4th at 699. To answer this question, the Court must independently analyze each Defendant's conduct "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Hinson v. Bias, 927 F.3d 1103, 1117 (11th Cir. 2019) (internal quotation marks and citations omitted); see also Alocer, 906 F.3d at 951. Weighing the six factors described in Wade, 36 F.4th at 1325, the answer to this second question is also "no" for both Defendants.

### a. The Severity of Plaintiff's Alleged Crime

The first factor, the severity of the crime at issue, weighs in favor of Defendants. When Defendants arrived on scene and attempted to arrest Plaintiff, they believed that he had engaged in a serious, potentially violent crime. See Dkt. No. 18-4 at 30:22-25 ("I believed that he was involved in a violent, forcible felony where he had held a female victim hostage and essentially committed a robbery by forcing her to obtain money from an ATM."); Dkt. No. 18-3 at 27-29. The crimes which Defendants

believed Plaintiff had possibly committed—kidnapping[11] and robbery—are undoubtedly serious felonies. See, e.g., Sims v. City of Hamilton, No. 6:18-CV-1967, 2020 WL 6712271, at *5 (N.D. Ala. Nov. 16, 2020) (finding that a possible hostage-taking is a severe crime in assessing the reasonableness of an officer's use of force); Chapman v. Watson, No. 2:19-CV-33, 2021 WL 5260298, at *10 (S.D. Ga. Aug. 4, 2021) (finding that a potential kidnapping is a serious crime under the Graham factors), report and recommendation adopted, 2021 WL 4149647 (Sept. 13, 2021); Hunter v. Harris, No. 1:15-CV-3386, 2018 WL 9615000, at *4 (N.D. Ga. Aug. 15, 2018) (finding robbery to be a severe crime under the Fourth Amendment's reasonableness standard).

**b. Whether Plaintiff Posed an Immediate Threat of Harm to Others**

The second factor, the threat of harm posed by Plaintiff, favors Defendants. Even if Plaintiff had no intention to threaten or hurt Defendants, this was not known to Defendants at the time of the incident. Plaintiff refused to cooperate or follow Defendants' commands and physically obstructed their efforts to arrest him. Analyzing Plaintiff's actions, an officer in

---

[11] Hostage-taking is charged as the crime of kidnapping under Georgia law. See O.C.G.A. § 16-5-40(a) ("A person commits the offense of kidnapping when such person abducts or steals away another person without lawful authority or warrant and holds such other person against his or her will.")

Defendants' position could reasonably believe that Plaintiff posed an immediate threat of harm to others.

Plaintiff did not hit or punch Defendants, but he repeatedly swung his arms—with loose handcuffs attached only to one wrist—in the direction of Defendants. See Dkt. No. 18-4 at 84:18-24; Dkt. No. 20-6. In her deposition, Officer Oliver testified that when Plaintiff swung his arms, she believed that he was "potentially [] trying to strike" Officer Chambers. Dkt. No. 18-4 at 85:2-6. This belief is supported by Officer Oliver's body camera footage. As the body camera footage shows, Plaintiff had only one hand handcuffed for around two minutes. Dkt. No. 20-6 at 01:00-03:03. In this two-minute span, Plaintiff had a physical altercation with Defendants where he freely swung his arms and forcibly prevented Defendants from arresting him. Id. During this altercation, Plaintiff could have easily used the loose handcuff as a weapon against Defendants.

The Eleventh Circuit has explained that "an arrestee with only one hand handcuffed may pose a danger to officers because 'without both hands shackled, the single handcuff could be used as a weapon.'" Baker v. Clements, 760 F. App'x 954, 957-58 (11th Cir. 2019) (quoting Hoyt, 672 F.3d at 979). In Baker, for example, the defendant officers used "fist strikes" to gain control of the plaintiff arrestee. 760 F. App'x at 957. The Eleventh Circuit found

that this use of force was reasonable under the Fourth Amendment because

> [w]hen Defendant Officers employed the fist strikes, Plaintiff had just attempted to evade arrest by flight and had refused multiple orders to get on the ground, to stop resisting, and to give his hands to the officers. An objective officer could also have believed reasonably that Plaintiff—who had only a single hand in handcuffs—presented an immediate threat to Defendant Officers' safety when the fist strikes were used.

Id. This case presents similar facts. Further, Officer Oliver believed Plaintiff took a fighting stance three times before she deployed her taser, which also posed a threat. Dkt. No. 18-4 at 108–09; see Myrick v. Fulton Cnty., 69 F.4th 1277, 1302 (11th Cir. 2023) (finding that an officer's use of a taser was appropriate when an inmate took a fighting stance, and the officer believed his safety was threatened). Given Plaintiff's continual resistance, his repeated refusals to surrender, the loose handcuff which he swung around, and his stance, an objective officer would have believed that Plaintiff posed an immediate threat to both Defendants.[12]

---

[12] In cases with similar facts, other courts in the Eleventh Circuit have also found that an arrestee posed a safety risk to officers. See, e.g., Hoyt, 672 F.3d at 979 (finding that an arrestee who had one hand handcuffed and prevented officers from handcuffing his free hand posed a danger to the officers); Moya v. Jackson, No. 1:21-CV-3481, 2023 WL 7109679, at *11 (N.D. Ga. Sept. 18, 2023) ("[T]here was a threat to the officers when they were only able to secure one of Plaintiff's hands for the arrest.").

**c. Whether Plaintiff Actively Resisted Arrest or Tried to Flee**

There is no question that Plaintiff actively resisted arrest.[13] Plaintiff intentionally prevented Defendants from arresting him. Both Defendants gave Plaintiff multiple warnings to "stop," "put your hands behind your back," and to "get on the ground." Dkt. No. 20-6 at 00:30–03:00. Plaintiff refused to comply with these orders. Id. Plaintiff also refused to surrender himself to the officers. He snatched his hands away when Defendants tried to hold or handcuff him, and he spread his arms apart to prevent handcuffing. Id. Plaintiff tussled with Defendants when they tried to force him to the ground, forcibly moving them to prevent his arrest. Id. By Plaintiff's own admission, he did not comply with Defendants. See Dkt. No. 18-2 at 49:5-9 (explaining that "the reason I didn't really comply" was because Defendants did not

---

[13] The common definition of "resisting arrest" is "intentionally preventing a peace officer from effecting a lawful arrest." Heck v. Humphrey, 512 U.S. 477, 486 n.6 (1994) (citation omitted). Defendants arrested Plaintiff without a warrant. For a warrantless arrest to be lawful, the arrest must be supported by probable cause. Skop, 485 F.3d at 1137. Here, looking at the totality of the circumstances, there is no material dispute that Defendants had probable cause to arrest Plaintiff. See Illinois v. Gates, 462 U.S. 213, 230-31 (1983). Plaintiff matched the physical description of the man accused of hostage-taking; he carried a cell phone and set of keys, which also matched the suspect's description; and he referenced his accuser with familiarity. Dkt. No. 20-6. A reasonable officer knowing these facts could believe that Plaintiff had committed a crime. See Paez v. Mulvey, 915 F.3d 1276, 1285 (11th Cir. 2019) (quoting Durruthy v. Pastor, 351 F.3d 1080 (11th Cir. 2003)). Defendants, therefore, had probable cause to arrest Plaintiff and could legally arrest him.

sufficiently explain why he was being arrested). Plaintiff also said that when he physically prevented Defendants from handcuffing him, "I was just standing my ground." Id. at 47:2.

While Plaintiff argues that he did not actively resist arrest, this argument is belied by the undisputed facts and video evidence. Dkt. No. 20 at 14–16; see also Scott, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Plaintiff argues that, at one point during the incident, he "stands calmly, posing no threat, and not attempting to flee." Id. at 16 (citing Dkt. No. 20-6 at 01:25 to 03:10). This is not so. During this timespan in the video, Plaintiff does not stand calmly, but is on the ground with Officer Chambers, forcibly rolling her onto her back and snatching his arms away from her. Dkt. No. 20-6 at 01:25–03:10. Plaintiff then continues to physically overpower Defendants, preventing them from detaining him. Id.

During the body camera footage, Plaintiff also begins to walk away from Defendants. Id. Although Plaintiff told Defendants that he was not going to flee, police officers cannot be expected to rely on the word of an uncooperative arrestee who is actively and physically resisting arrest and thwarting officers' attempts to detain him. A reasonable officer in this situation would believe

that Plaintiff was trying to flee. Officer Chambers believed this as well. See Dkt. No. 18-3 at 49:12–16.

Taking these undisputed facts together, this factor supports Defendants. At the time of the incident, Defendants would have reasonably believed that Plaintiff was actively resisting arrest or trying to flee.

**d. The Need for the Use of Force**

Defendants' arrest of Plaintiff could have quickly escalated into a violent incident had Officer Oliver not tased Plaintiff. In this regard, this case is similar to Draper v. Reynolds. 369 F.3d at 1278. In Draper, the defendant officer stopped the plaintiff arrestee for a traffic violation and told the plaintiff to get out of the vehicle. Id. at 1272–73. The plaintiff complied, and the officer then asked for the plaintiff's driver's license. Id. at 1273. At this point, the plaintiff began shouting, complaining, and insisting that he had done nothing wrong. Id. "During the encounter, [the plaintiff] was belligerent, gestured animatedly, continuously paced, appeared very excited, and spoke loudly." Id. The officer threatened to arrest the plaintiff and requested that the plaintiff produce additional documents. Id. Plaintiff refused to comply and continued complaining and accusing the officer of harassment. Id. The officer gave multiple commands for the plaintiff to retrieve the documents, but when the plaintiff again refused to comply, the officer deployed his taser. Id. The Eleventh

Circuit ultimately found that the officer's use of force was reasonable. Id. at 1278. As the court explained:

> Because Draper repeatedly refused to comply with Reynolds's verbal comments, starting with a verbal arrest command was not required in these particular factual circumstances. More importantly, a verbal arrest command accompanied by attempted physical handcuffing, in these particular factual circumstances, may well have, or would likely have, escalated a tense and difficult situation into a serious physical struggle in which either Draper or Reynolds would be seriously hurt. Thus, there was a reasonable need for some use of force in this arrest.

Id. The same logic applies here.

The need for the use of force in this case appears to rise above the need for force in Draper. Where Draper involved an uncooperative arrestee who verbally refused to comply with the officer's commands, this case involves both verbal and physical resistance. Like the plaintiff in Draper, Plaintiff spoke loudly, complained of being stopped, gestured animatedly, continually paced, and appeared very excited. Here, though, Plaintiff's encounter with Defendants escalated into a physical skirmish. While no serious bodily force was used, this altercation could have escalated into a serious, life-threatening fight. Plaintiff repeatedly overpowered both officers, and by the time Officer Oliver used the taser the second time, both officers admitted that they could not continue their attempt to arrest Plaintiff without using the taser. See Dkt. No. 18-3 at 45:6-8 (Officer Chambers explains that Plaintiff had to be tased because: "We were tired.

We could no longer struggle."); Dkt. No. 18-4 at 145:3-23 (Officer Oliver explains that when she tased Plaintiff the second time, she was fatigued from the struggle with Plaintiff). As Officer Chambers succinctly put it, Defendants "were out of gas." Dkt. No. 18-3 at 41:14. Officer Oliver's use of the taser here was reasonably necessary as it became obvious that Defendants could not arrest Plaintiff using physical power and Plaintiff could continue overpowering Defendants. Additionally, any tackles made by Defendants, which were unsuccessful, were also reasonably necessary to detain Plaintiff.

This factor favors Defendants. When Defendants used force against Plaintiff in the form of a taser, a tackle, or any other action seen in the body camera footage, the use of force was needed to restrain Plaintiff and complete his arrest.

### e. The Relationship Between the Need for Force and the Amount of Force Used

The undisputed facts also show that the force used by Defendants was proportionate. As the Eleventh Circuit found in Draper: "Although being struck by a taser gun is an unpleasant experience, the amount of force [the officer] used—a single use of the taser gun causing a one-time shocking—was reasonably proportionate to the need for force and did not inflict any serious injury." 369 F.3d at 1278. Here, Officer Oliver twice fired her taser at Plaintiff, but only one deployment succeeded. Although

Plaintiff testified that he felt a shock from the first deployment, the body camera footage shows that he was clearly unaffected and continued to actively resist arrest. Dkt. No. 20-6. Officer Oliver's second taser deployment was proportionate. Plaintiff continued to pose a threat, the situation was rapidly changing and possibly escalating, and Defendants could no longer continue their attempt to physically restrain Plaintiff. Like the plaintiff in Draper, Plaintiff "was standing up, handcuffed, and coherent shortly after the taser gun stunned and calmed him." 369 F.3d at 1278. The use of the taser subdued Plaintiff for an appropriate period of time in which Defendants could successfully handcuff him and gain control of the situation. Any other uses of physical force by Defendants, including tackling or grabbing Plaintiff, were also proportionate to the need for forcibly restraining Plaintiff.

### f. Plaintiff's Injuries

Plaintiff himself admitted that he has no long-term injuries resulting from this incident. Dkt. No. 18-2 at 62-64. After Officer Oliver tased Plaintiff, he exhibited no signs of serious injury. Dkt. No. 20-6 at 03:03-12:00. To the extent that Plaintiff was injured, these injuries were minor and short-lived. Plaintiff did not take any medicine for his injuries, did not have any physical limitations, and received no treatment other than his initial hospital visit. Id. at 64. As such, this factor also weighs in favor of Defendants.

36

### 3. Conclusion

Viewing the six Wade factors in totality, the undisputed facts show that Defendants' actions were objectively reasonable "in light of the facts and circumstances confronting them." Graham, 490 U.S. at 397. In the heat of the moment, Defendants had to make split-second decisions while confronting an uncooperative Plaintiff, who actively resisted arrest, overpowered Defendants, and imperiled Defendants' safety. After Defendants gave Plaintiff multiple warnings and Plaintiff refused to comply, Officer Oliver attempted to tase Plaintiff. This failed. Defendants then attempted to physically subdue Plaintiff. This failed. Finally, as Defendants could no longer continue fighting to detain Plaintiff, Officer Oliver fired her taser one time. This succeeded. Defendants arrested Plaintiff without further incident, and Plaintiff suffered no serious injuries. The use of force in this case was proportionate and prevented an already tense situation from escalating into a possibly life-threatening one. Looking at totality of the undisputed facts surrounding Plaintiff's arrest, Plaintiff has failed to establish a constitutional violation. Because Plaintiff fails to meet this requirement, Defendants are entitled to qualified immunity. Therefore, Defendants' motion for summary judgment as to Plaintiff's excessive force claim is **GRANTED**. See Hope, 536 U.S. at 736.

III.  **Plaintiff's Section 1983 Fourth Amendment Failure to Intervene Claim Against Defendant Officers Chambers and Oliver**

1. **Overview**

"[A]n officer can be liable for failing to intervene when another officer uses excessive force." Priester v. City of Riviera Beach, 208 F.3d 919, 924 (11th Cir. 2000) (citing Ensley v. Soper, 142 F.3d 1402, 1407-08 (11th Cir. 1998) ("If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable.")); see also Velasquez v. City of Hialeah, 484 F.3d 1340, 1341 (11th Cir. 2006) ("[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable for his nonfeasance." (internal quotation marks and citation omitted)).

The lynchpin of a failure to intervene claim is an underlying constitutional violation. Williams v. Corr. Officer Radford, 64 F.4th 1185, 1199 (11th Cir. 2023). If there was no constitutional violation, the failure to intervene claim fails. Sebastian v. Ortiz, 918 F.3d 1301, 1312 (11th Cir. 2019) ("[A]n officer cannot be held liable for failing to stop or intervene when there was no constitutional violation being committed."). To survive summary judgment, a plaintiff bringing a failure to intervene claim must

38

present sufficient evidence to permit a reasonable jury to find that the defendant officer was "(1) in a position to intervene in an ongoing constitutional violation and (2) failed to do so." Williams, 64 F.4th at 1199 (citing Priester, 208 F.3d at 924).

## 2. Analysis

Plaintiff's failure to intervene claim fails. As explained above, there was no constitutional violation of excessive force. Defendant Officers Chambers and Oliver cannot be liable for a failure to intervene claim when no constitutional violation occurred. Sebastian, 918 F.3d at 1312. As a result, Defendants are entitled to qualified immunity. Therefore, Defendants' motion for summary judgment as to Plaintiff's failure-to-intervene claim is **GRANTED**.

## IV. Plaintiff's Section 1983 Fourth Amendment Municipal Liability Claim Against Defendant Glynn County

### 1. Overview

Municipalities and other local government entities are considered "persons" under § 1983. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). The Supreme Court, however, "has placed strict limitations on municipal liability under § 1983." Grech v. Clayton Cnty., 335 F.3d 1326, 1329 (11th Cir. 2003). "[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell, 436

U.S. at 691. This is because "the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." Id. Put differently, a local government "will be liable under section 1983 only for acts for which the local government is actually responsible." Marsh v. Butler Cnty., 268 F.3d 1014, 1027 (11th Cir. 2001) (en banc) (citing Turquitt v. Jefferson Cnty., 137 F.3d 1285, 1287 (11th Cir. 1998)).

Municipal liability attaches only where the local government's custom or policy caused its employee to violate the plaintiff's constitutional rights. Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998) (citations omitted). "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom[14] or policy[15] that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing City of Canton v. Harris, 489 U.S.

---

[14] "A custom is a practice that is so settled and permanent that it takes on the force of law." Cooper v. Dillon, 403 F.3d 1208, 1221 (11th Cir. 2005).

[15] "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." Id.

378, 385 (1989)); <u>see also</u> <u>Scott v. Miami Dade Cnty.</u>, No. 21-13869, 2023 WL 4196925, at *8 (11th Cir. June 27, 2023) (applying the three <u>McDowell</u> requirements to a § 1983 supervisory liability claim against a county).

The threshold requirement for a municipal liability claim is a constitutional violation. <u>Mann v. Joseph</u>, 805 F. App'x 779, 785–86 (11th Cir. 2020) (citations omitted). "Only when it is clear that a violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise." <u>Vineyard v. Cnty. of Murray</u>, 990 F.2d 1207, 1211 (11th Cir. 1993). If no constitutional violation occurred, the plaintiff's municipal liability claim fails as a matter of law. <u>Mann</u>, 805 F. App'x at 786 (citing <u>Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986)).

### 2. Analysis

Plaintiff fails to satisfy the threshold requirement of his municipal liability claim against Glynn County. Plaintiff has not shown that his constitutional rights were violated by Defendants Chambers and Oliver. Because this initial requirement is not met, the Court need not address the remaining two <u>McDowell</u> requirements. <u>See</u> <u>Heller</u>, 475 U.S. at 799 ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); <u>see also</u> <u>Holland v. City of Auburn</u>, 657

F. App'x 899, 905 (11th Cir. 2016) ("Plaintiff's municipal liability claims against the City fail because Plaintiff has not demonstrated that he suffered a constitutional violation."). As Plaintiff cannot meet the threshold requirement of his municipal liability claim, Defendant Glynn County's motion for summary judgment is **GRANTED** as to this claim.[16]

---

[16] Even if Plaintiff established a constitutional violation, which he has not, Defendant Glynn County would still be entitled to summary judgment. This is because Plaintiff has not established a policy or custom that constituted deliberate indifference. "In order for a plaintiff to demonstrate a policy or custom, it is generally necessary to show a persistent and wide-spread practice." McDowell, 392 F.3d at 1290. Plaintiff has failed to establish that there is a widespread custom of using excessive force among Glynn County law enforcement officers. He has not identified any similar incidents or any other complaints of excessive force. Plaintiff has also "failed to identify any official policy that condones or promotes the use of excessive force by [Glynn County] officers in effecting arrests." Ludaway v. City of Jacksonville, 245 F. App'x 949, 951 (11th Cir. 2007). Glynn County's policies permit officers to "use whatever force is reasonable and necessary to protect others or themselves from bodily harm" and permit the use of non-lethal force "only after all reasonable attempts to avoid physical confrontation have been exhausted or at the point where it becomes obvious to the officer that no other recourse is open." Dkt. No. 20-9 at 2-3. These policies, and other policies in the record, do not condone or promote the use of excessive force. Finally, Plaintiff has not established that Glynn County failed to train or supervise its officers. To succeed here, Plaintiff must have shown that Glynn County "knew of a need to train and/or supervise in a particular area and . . . made a deliberate choice not to take any action." Gold, 151 F.3d at 1350 (citations omitted). "[W]ithout notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise." Id. (footnote omitted). Here, Plaintiff presented no evidence of a history of widespread abuse or any other practices that would put Glynn County on notice of the need for improved training or supervision. There is no record evidence that Glynn County was on notice of prior incidents of constitutional

**V.   Plaintiff's State Law Claims for Battery and Assault Against All Defendants**

After granting summary judgment on Plaintiff's § 1983 claims against Defendants—the only federal claims in this action—the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims which lack an independent jurisdictional basis. See 28 U.S.C. § 1367(c)(3) (permitting a court to decline exercising supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction"); see also Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088-89 (11th Cir. 2004) ("The decision to exercise supplemental jurisdiction over pendant state claims rests within the discretion of the district court. We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." (citations omitted)); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").

---

violations involving tasers or any other use of force. Thus, Glynn County is entitled to summary judgment.

The Court, therefore, **DISMISSES without prejudice** Plaintiff's state law claims. See <u>Carnegie-Mellon Univ.</u>, 484 U.S. at 350 ("[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." (citing <u>Mine Workers v. Gibbs</u>, 383 U.S. 715, 726-27 (1966)) (footnote omitted)); <u>see also</u> <u>Smith v. Franklin Cnty.</u>, 762 F. App'x 885, 891 n.3 (11th Cir. 2019) (affirming the district court's dismissal of state law claims without prejudice after it granted summary judgment on the federal claims).

## VI.   Plaintiff's Claims for Punitive Damages and Attorney's Fees

### 1. Punitive Damages

Plaintiff cannot recover punitive damages. To begin, municipalities are immune from punitive damages in suits brought under § 1983. <u>Gonzalez v. Lee Cnty. Hous. Auth.</u>, 161 F.3d 1290, 1299 n.30 (11th Cir. 1998) (citing <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247 (1981)). This, coupled with the fact that Defendant Glynn County committed no constitutional violation, means that Plaintiff cannot recover punitive damages for his federal claims against Glynn County. As to Defendant Officers Chambers and Oliver, Plaintiff must establish that Defendants were "motivated by an evil motive or intent, or there must be reckless or callous indifference to federally protected rights" to receive

44

punitive damages for his § 1983 claim. <u>Anderson v. Atlanta</u>, 778 F.2d 678, 688 (11th Cir. 1985) (citing <u>Smith v. Wade</u>, 461 U.S. 30 (1983)). As explained above, Plaintiff has not established that Defendants Chambers and Oliver committed any constitutional violation, and he has not established that any of the requirements for punitive damages exist here. Plaintiff, therefore, is not entitled to punitive damages for his § 1983 claims against Officers Chambers and Oliver. Thus, Defendants' motion for summary judgment as to Plaintiff's federal claim for punitive damages is **GRANTED**.[17]

**2. Attorney's Fees**

Plaintiff's claims for attorney's fees also fail. Plaintiff cannot recover attorney's fees for his § 1983 claims when these substantive claims fail. See 42 U.S.C. § 1988(b) ("[T]he court, in its discretion, may allow the *prevailing* party, other than the United States, a reasonable attorney's fee." (emphasis added)). Because all of Plaintiff's federal substantive claims fail, Plaintiff's claims for attorney's fees on his federal claims fail as well. Therefore, Defendants' motion for summary judgment as to Plaintiff's federal claim for attorney's fees is **GRANTED**.[18]

---

[17] As stated in Section V, Plaintiff's state law claims, including his claim for punitive damages, are **DISMISSED without prejudice.**
[18] As stated in Section V, Plaintiff's state law claims, including his claim for attorney's fees, are **DISMISSED without prejudice.**

## CONCLUSION

For these reasons, Defendants' motion for summary judgment, dkt. no. 18, is **GRANTED** as to:

- Plaintiff's § 1983 excessive force claim against Defendants Chambers and Oliver (Count I);

- Plaintiff's § 1983 failure to intervene claim against Defendants Chambers and Oliver (Count I);

- Plaintiff's § 1983 municipal liability claim against Defendant Glynn County (Count III);

- Plaintiff's federal claim for punitive damages; and

- Plaintiff's federal claim for attorney's fees.

These claims are therefore **DISMISSED with prejudice.** Further, the Court declines to exercise supplemental jurisdiction as to Plaintiff's state law claims, that is:

- Plaintiff's claim for assault and battery against all Defendants (Count II);

- Plaintiff's claim for punitive damages; and

- Plaintiff's claim for attorney's fees.

Plaintiff's state law claims are therefore **DISMISSED without prejudice.** There being no claims remaining in this federal action, the Clerk is **DIRECTED** to enter judgment in favor of Defendants on the federal claims and close this case.

**SO ORDERED** this 15th day of February, 2024.

_____

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA